## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BLUEFIELD DIVISION

**BETTY M. MEADOWS,**

      **Plaintiff,**

**v.**                                **Case No.: 1:14-cv-15147**

**CAROLYN W. COLVIN,**
**Acting Commissioner of**
**Social Security,**

      **Defendant.**


### PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's brief requesting reversal of the Commissioner's decision and an award of benefits; and the Commissioner's brief in support of her decision, requesting judgment in her favor. (ECF Nos. 11 & 14).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for

judgment on the pleadings be **DENIED;** that the Commissioner's request for judgment on the pleadings also be **DENIED;** that the Commissioner's decision be **REVERSED,** as it is not supported by substantial evidence; this matter be **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g); and that this civil action be **DISMISSED, with prejudice,** and removed from the docket of the Court.

## I.   Procedural History

On November 30, 2010, Plaintiff Betty M. Meadows ("Claimant"), filed applications for DIB and SSI, alleging a disability onset date of November 13, 2010, (Tr. at 145, 152), due to "paroxysmal atrial fibrillation; 5 stents; coronary artery disease; hypertension; hyperlipidemia; obesity; possible sleep apnea; rheumatoid arthritis; back and shoulder pain; anxiety; heart attack 5 stents high blood sleep apnea arthritis." (Tr. at 171). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 63, 77). Claimant then filed a request for an administrative hearing, which was held on January 28, 2013, before the Honorable Benjamin R. McMillion, Administrative Law Judge ("ALJ"). (Tr. at 30-58). By written decision dated February 11, 2013, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 11-22). The ALJ's decision became the final decision of the Commissioner on April 11, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an answer and a transcript of the administrative proceedings. (ECF Nos. 9 & 10). Claimant filed a Brief in Support of Judgment on the Pleadings, in which she requests that the Court reverse the decision of the Commissioner and award her benefits. (ECF No. 11). Claimant does not seek a

remand, because '[t]he evidence undeniably illustrates the extent and severity of Plaintiff's disability;" thus, "[r]emand would only achieve a delay in the inevitable." (*Id.* at 11). The Commissioner responded with a Brief in Support of Defendant's Decision, (ECF No. 14), and Claimant filed a reply memorandum. (ECF No. 15). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 42 years old at the time she filed the instant applications for benefits, and 44 years old on the date of the ALJ's decision. (Tr. at 11, 145, 152). She has a high school education and communicates in English. (Tr. at 35, 170, 172). Claimant previously worked as an adult caretaker. (Tr. at 35-36, 172-173).

## III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c).

3

A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured

status for disability insurance benefits through December 31, 2015. (Tr. at 13, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since November 13, 2010, the alleged disability onset date. (Tr. at 13, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "history of myocardial infarction, status post five stents, leg pain, generalized joint pain, and depressive disorder." (Tr. at 13-14, Finding No. 3). The ALJ considered Claimant's additional alleged impairments, but determined that they were non-severe. (*Id.*).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 14-15, Finding No. 4). Accordingly, the ALJ assessed Claimant's RFC, indicating that she had:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally climb, balance, kneel, stoop, crouch, and crawl. She should avoid concentrated exposure to extremely cold/hot temperatures, vibration, fumes, odors, dust, gases, and poor ventilation. She is limited to 1-2 step job instructions.

(Tr. at 15-20, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform her past relevant work. (Tr. at 20, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 21, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1968, and was defined as a younger individual age 18-49 on the alleged disability onset date; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because using the Medical-

Vocational Rules as a framework supported a finding that the Claimant was "not disabled," whether or not the Claimant had transferable job skills. (Tr. at 21, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, (Tr. at 21-22, Finding No. 10), including work in light, unskilled occupations, such as cashier; mail routing clerk; and cafeteria attendant. (*Id.*). Consequently, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act, and thus was not entitled to benefits. (Tr. at 22, Finding No. 11).

## IV.   __Claimant's Challenge to the Commissioner's Decision__

Claimant raises two challenges to the Commissioner's decision. (ECF No. 11 at 4). First, Claimant insists that the ALJ's RFC finding is not supported by substantial evidence. Second, Claimant contends that the Appeals Council erred by failing to consider new evidence from Claimant's treating physicians that directly contradicted the ALJ's decision.

With respect to her first challenge, Claimant argues that the ALJ's RFC determination is faulty, because he overlooked key opinions supplied by Claimant's cardiologist and vascular surgeon. According to Claimant, these physicians substantiate the presence of arteriosclerosis in her lower extremities that is so severe, it is immobilizing. However, Claimant maintains that, rather than acknowledging the physicians' descriptions of disabling impairment, the ALJ "cherry-picked" the medical evidence. By highlighting benign findings and omitting serious ones, the ALJ left a false impression that Claimant's peripheral vascular condition is not particularly serious when, in reality, her arteries are completely occluded, substantially limiting her ability to walk, stand, and sit for extended periods of time. (*Id.* at 7-9).

In her second challenge, Claimant asserts that the Appeals Council improperly rejected new and material evidence supporting the validity of Claimant's application for benefits. After the administrative hearing, Claimant's cardiologist and vascular surgeon answered interrogatories specifically designed to elicit their opinions on whether Claimant was capable of performing light exertional work as determined by the ALJ. Both physicians found Claimant incapable of standing and walking the six hours per eight-hour workday required by light level work, and at least one of the physicians opined that Claimant had a "disabling claudication."[1] Claimant argues that the ALJ gave great weight to the opinions of state agency consultants without providing a thorough analysis of the reasons, and the Appeals Council simply adopted those opinions without reconciling the plainly contradictory opinions offered by her treating physicians. (*Id.* at 9-12). Claimant insists that rather than remanding the case, the Court should reverse the decision of the Commissioner and award benefits based upon the strength of this new evidence. (*Id.* at 11).

In response, the Commissioner contends that the ALJ appropriately determined that Claimant possessed the ability to perform light work. (ECF No. 14 at 4). The Commissioner points out that the ALJ gave great weight to clinical findings in the record, including those recorded by Claimant's vascular surgeon and cardiologist, who documented that Claimant's tolerance to exercise was improving, and who recommended that she engage in as many activities as she could tolerate. (ECF No. 14 at 4-7). According to the Commissioner, the medical records reflect that Claimant had a

---

[1] Claimant was assessed with intermittent claudication, which is "a cramping pain and weakness in the legs and especially the calves on walking that disappears after rest and is usually associated with inadequate blood supply to the muscle." *See* Medline Plus Medical Dictionary © 2015 by Merriam-Webster, Incorporated.

good response to treatment, and her daily activities bolstered those findings. (*Id.* at 9-10).  Moreover, the ALJ correctly consulted with a vocational expert to determine what, if any, occupations were suitable given Claimant's specific limitations. (*Id.* at 4). Finally, the Commissioner stresses that, contrary to the opinions Claimant obtained soon after the Commissioner's unfavorable decision, at no time did Claimant's physicians impose any particular restrictions on her activities. (*Id.* at 10-12). Therefore, the opinions submitted to the Appeals Council did not consist of new clinical evidence of a worsening medical condition; instead, the opinions were merely subjective statements without any objective basis in the record. (*Id.* at 12).

## V.    Relevant Medical Evidence

The undersigned has reviewed all of the evidence of record, including documentation of Claimant's health care examinations, evaluations, and treatment. The relevant medical information is summarized as follows.

### A. Treatment Records

On November 12, 2010, Claimant presented to Princeton Community Hospital Emergency Department with complaints of left chest and arm pain, shortness of breath, and sweating. (Tr. at 257). An EKG showed non-specific changes, but cardiac enzymes were consistent with a myocardial infarction. (Tr. at 265). Accordingly, Claimant was treated with intravenous medications and transferred to a cardiologist at Roanoke Memorial Hospital for further evaluation and care. (Tr. at 273-74).

On November 13, 2010, the cardiologist, Dr. Joann Journigan, noted that Claimant was transferred from Princeton after having a non-ST segment elevation myocardial infarction ("NSTEMI"). (Tr. at 340). Claimant reported having left shoulder pain for several weeks, both at rest and with exertion, which was relieved with pain

8

medication. While at work on November 12, 2010, she began to have an aching sensation across her chest accompanied by mild shortness of breath and sweating. She went to the hospital where she was diagnosed with a heart attack and treated until stabilization and transfer. (*Id.*). Claimant's past medical history included hypertension and hyperlipidemia. A physical examination revealed Claimant's heart to have a regular rate and rhythm; S1, S2 were normal with no murmur, click, rub or gallop. (Tr. at 342). Her extremities were normal, with no sign of cyanosis or edema, and the pulses were 2+ and symmetrical, bilaterally. (Tr. at 342). Claimant was admitted to the intensive care unit to treat her pain, with a catheterization planned for later in the day. (Tr. at 343).

Dr. Eric Williams, an interventional cardiologist at Roanoke Memorial Hospital, performed the left heart catheterization on Claimant on November 13, 2010, along with a selective coronary arteriography and a percutaneous coronary intervention of the proximal to mid circumflex using one bare metal stent. (Tr. at 344-45). Dr. Williams documented the presence of a NSTEMI secondary to a presumed total occlusion of the circumflex coronary artery; a residual small right coronary artery, with a total mid occlusion and late slow filling to the distal segment; a medium caliber left anterior descending artery, with diffuse moderate disease to the apex and septal collateral network to the distal right coronary artery; and a high bifurcating diagonal branch, with a smooth moderate ostial narrowing. (Tr. at 345). Dr. Williams successfully revascularized the proximal to mid left circumflex coronary artery using the metal stent.

While still recovering from the procedure, Claimant experienced atrial fibrillation on November 16, 2010. (Tr. at 350). An examination of her heart revealed irregular rhythm and tachycardia, but no gallops or murmurs. An examination of the lower extremities showed mild bilateral edema, with 2-3+ pulses in the anterior and posterior

9

tibialis pedis and right groin without hematoma. (Tr. at 350-351). That evening, Dr. Williams performed a second percutaneous coronary intervention of the proximal to mid right coronary artery on Claimant, using three bare metal stents. (Tr. at 346-347). During the procedure, Dr. Williams observed a residual subtotal occlusion of a small caliber, dominant right coronary artery. (Tr. at 347). He successfully revascularized the right coronary artery using the stents.

On November 17, 2010, Claimant was deemed hemodynamically stabilized and was discharged. (Tr. at 338-39). She was told to follow up with her family cardiologist, Gordon Prescott, M.D., in two weeks and was given discharge medications, including aspirin, Atenolol, Plavix, sublingual nitroglycerin, Zocor, and Ambien. (Tr. at 338). The discharge diagnosis was NSTEMI; status post percutaneous coronary intervention to the left circumflex and right coronary arteries, with bare metal stents; coronary artery disease; hypertension; hyperlipidemia; obesity; and ongoing tobacco abuse. (*Id.*).

The next day, Claimant presented to Princeton Community Hospital with complaints of chest palpitations, shortness of breath, nausea, and fluid buildup in her legs. (Tr. at 277). A chest x-ray revealed moderate cardiomegaly and early congestive heart failure. Superimposed infiltrates of the lung bases could not be ruled out. (Tr. at 330). Claimant also had a sustained supraventricular tachycardia that did not respond to vagal maneuvers and, therefore, an amiodarone drip and bolus was started. (Tr. at 424). Echocardiogram reports at various times that day revealed sinus bradycardia, interspersed with other abnormal heart rhythms and rates, including atrial fibrillation. (Tr. at 327-29). Once again, Claimant was transferred to Roanoke Memorial Hospital. (Tr. at 424-26).

Upon arrival, Claimant was examined by Dr. Ernesto Umana, a cardiologist. (Tr.

at 424). Her physical examination showed clear chest sounds, bilaterally, with mild pulmonary crackles in bases; S1 and S2 heard, although no murmurs. A regular heart rhythm was present. An examination of Claimant's legs revealed moderate swelling, but distal pulses intact (Tr. at 425). Claimant was assessed with shortness of breath, supraventricular tachycardia/atrial fibrillation with rapid ventricular response, and coronary artery disease. (*Id.*). An echocardiogram reflected cardiomyopathy with overall preserved global left ventricular systolic function; ejection fraction of 55-60%; akinesis of the proximal to mid anterolateral and the mid to distal inferolateral segments; moderate mitral regurgitation with an eccentric jet, which likely resulted from tenting of the posterior mitral valve leaflet; mild to moderate tricuspid insufficiency; and dilated inferior vena cava, suggestive of elevated right-sided pressures. (Tr. at 427-28). On November 22, 2010, Claimant was discharged with a diagnosis of paroxysmal atrial fibrillation; recent NSTEMI; status post percutaneous coronary intervention to left circumflex and right coronary arteries, with bare metal stents; coronary artery disease; hypertension; hyperlipidemia; obesity; and tobacco abuse. Claimant's medical regimen included aspirin, Plavix, Zocor, Lasix, Potassium chloride, Atenolol, Coumadin, and nitroglycerin sublingual. (Tr. at 422).

On August 25, 2011, Claimant presented to her orthopedist, Dr. Yogesh Chand, with complaints of ongoing low back and right leg pain. She reported having numbness and tingling in her right leg, with a loss of balance, and stated that her leg had been "giving out." She had even fallen twice. Claimant indicated that she used a cane now. (Tr. at 676-78).

Claimant reported to her cardiologist, Dr. Prescott, on September 14, 2011 in follow-up of an overnight hospitalization caused by an episode of chest pain that was

partially relieved by nitroglycerin. (Tr. at 600). Dr. Prescott scheduled Claimant for a cardiolyte stress test. On September 22, 2011, Claimant had the stress test, which was interpreted as an equivocal myocardial perfusion study showing a small focus of diminished activity through the inferolateral aspect of the left ventricle that improved on the resting image. Lateral wall ischemia could not be ruled out, but an ejection fraction was normal. (Tr. at 569).

On November 7, 2011, Claimant was examined in follow-up by Dr. Journigan. Claimant reported having external chest pain although she was not very active due to pain in her hip. An examination of Claimant's extremities revealed no cyanosis, clubbing, or edema. Claimant's pulses were 2+ bilaterally. (Tr. at 606-08). Dr. Journigan noted that Claimant's recent myocardial perfusion scan was abnormal, showing ischemia in the lateral wall. For that reason, Dr. Journigan felt that Dr. Williams should re-evaluate Claimant and perform a left cardiac catheterization to check for restenosis of the stents and for new areas of stenosis. (Tr. at 608).

On November 18, 2011, Claimant was admitted to Roanoke Memorial Hospital for elective catheterization. Claimant's medical history included hypertension, hyperlipidemia, a long history of tobacco use, and progressive claudication involving both lower extremities, which now made it difficult for her to ambulate. (Tr. at 631). Claimant also reported weakness in her legs. Dr. Williams began the procedure, but was unable to get the wire past the proximal portion of the left common iliac artery. A sheath angiography showed a total occlusion of either the proximal left common iliac artery, or the distal aorta. Dr. Williams stopped further attempts to use Claimant's lower extremities for vascular access and gained access through the brachial artery. (Tr. at 632). The angiography revealed a moderate in-stent restenosis of the right coronary

artery, moderate non-obstructive disease of the left anterior descending, and a critical in-stent restenotic lesion in the proximal circumflex. A successful cutting balloon angioplasty of the proximal circumflex lesion was performed. By November 21, 2011, Claimant was ambulatory and stable for discharge. (*Id.*). Dr. Williams suggested that Claimant see a vascular surgeon, explaining that she would likely need peripheral bypass to treat obstructive lower extremity disease. He documented that Claimant had "become quite debilitated with claudication type symptoms and associated perceived leg weakness." (Tr. at 631).

On December 16, 2011, Claimant presented to Jesse T. Davidson, III, M.D., a vascular surgeon in Roanoke, for evaluation of "lower extremity claudication which is disabling." (Tr. at 647). Dr. Davidson noted that Claimant was referred by Dr. Williams after a cardiac catheterization revealed an occlusion or stenosis of the left iliac artery. Claimant complained of both legs hurting when she walked. A physical examination confirmed the absence of femoral, popliteal, and pedal pulses, indicating arteriosclerosis of the vessels in the lower extremities with claudication. (*Id.*). The treatment plan included weight loss, an exercise program of walking, and the addition of Trental, a medication used to treat peripheral claudication and occlusive disease in individuals with arteriosclerosis. (Tr. at 648).

Claimant returned to Dr. Chand's office on December 27, 2011 with continued complaints of pain. She also complained that she was losing her ability to walk, as well as her balance. (Tr. at 687). On examination, Claimant had a negative straight-leg raising test bilaterally, and her neurological examination was normal as well. (Tr. at 686). Dr. Chand documented that Claimant was on Coumadin, a blood thinner.

On January 10, 2012, Claimant returned to Dr. Prescott for cardiac follow-up.

(Tr. at 691). Claimant reported occasional palpitations when not taking Atenolol; however, she did not have chest pain. Dr. Prescott noted that Claimant was "still active physically." (*Id*.). Her physical examination revealed stable pressure, regular heart rhythm, grade I systolic murmur, and a few rhonchi bilaterally in the lungs. She was advised to continue her medication and return in two months. (Tr. at 691).

On March 16, 2012, Claimant returned to Dr. Davidson for a regularly scheduled evaluation. (Tr. at 738). Claimant was taking Trental 400 mg, and although she initially felt her symptoms had improved, she now had significant pain in both legs with walking, as well as nonischemic nocturnal pain. A physical examination of Claimant confirmed absent femoral, popliteal and pedal pulses, but no ischemic ulcers were present on Claimant's legs. Claimant was assessed with arteriosclerosis in the lower extremities "with disabling claudication." (*Id*.). Dr. Davidson ordered a CT angiogram of Claimant's pelvis, abdomen, and legs, (Tr. at 738), which was completed on March 20, 2012. Dr. Kelley Kendall Whitmer interpreted the study as showing an occlusion of the abdominal aorta at the bifurcation with large lumbar collaterals just proximal to the occlusion and occlusion of the common iliac arteries with reconstitution at their bifurcations bilaterally. (Tr. at 740-41). Mild hard plaque stenosis was seen in the internal iliac arteries bilaterally. However, the superficial and deep femoral arteries, the common femoral arteries, popliteal arteries, and popliteal trifurcation vessels showed no significant stenosis. (*Id.* at 740).

On July 13, 2012, Claimant returned to Dr. Davidson for follow-up of her aortic occlusion and "disabling claudication." (Tr. at 825). Claimant continued to take Trental and Tramadol for pain relief and reported that she no longer smoked cigarettes and her exercise tolerance was better. On examination, none of Claimant's lower extremity

pulses could be palpated. Dr. Davidson recommended that Claimant continue exercising and taking her medications. She was scheduled to see Dr. John Starr, III, later that day. Dr. Starr was a cardiologist, who had replaced Dr. Journigan on her recent departure from the medical group. Dr. Davidson told Claimant to also continue her regular follow-ups with Dr. Prescott.  (Tr. at 825).

Dr. Starr saw Claimant that afternoon as scheduled. (Tr. at 837). Claimant reported that she was doing well overall, with no chest pain or unusual dyspnea or edema. Claimant continued to take Coumadin and medications for high blood pressure and hyperlipidemia. A physical examination revealed no carotid bruits and no jugulovenous distention. Claimant's cardiac rhythm was regular, and her extremities revealed no edema or cyanosis. (Tr. at 837-39). Dr. Starr opined that Claimant was "doing quite well;" and therefore, he saw no reason for changes in her treatment plan. She was advised to continue the healthy heart diet, perform activity as tolerated, and return in four months. (Tr. at 839).

Claimant returned to Princeton Community Hospital on September 17, 2012 with complaints of chest pain. (Tr. at 918). Cardiac enzymes were negative with PT/INR stable. Claimant's physical examination revealed that she was neurologically intact with good muscle strength throughout the musculoskeletal system. A stress test was performed and was also interpreted as negative. However, due to her history of coronary artery disease, the Emergency Department physician consulted with Dr. Abdul Piracha, a cardiologist, to further evaluate Claimant. (Tr. at 918). Dr. Piracha examined Claimant's extremities and found normal femorals, no pedal edema, normal dorsalis pedis, and no varicosities. (Tr. at 919). Claimant's heart sounded normal, and her neurological examination was unremarkable. A myocardial perfusion study revealed

15

fixed defects in the lateral wall compatible with an old myocardial infarction, and Claimant's ejection fraction was 55%. (Tr. at 919). She was diagnosed with angina, with no active ischemia on myocardial perfusion study. Claimant was discharged to follow-up with Dr. Prescott in 2-3 weeks. Claimant was told that if she continued to have chest pain, another cardiac catheterization might be considered. (*Id.*).

On November 14, 2012, Claimant was examined by Dr. Starr. Claimant reported no recurrent chest pain. (Tr. at 928-30). Upon examination, her chest was clear. There was no jugulovenous distention and cardiac rhythm was regular. Her EKG study showed a normal sinus rhythm. There were increased anterior forces, but no change from prior tracings and no new or acute ST changes. Claimant was assessed with coronary artery disease, NSTEMI, subsequent care episode. Dr. Starr counseled Claimant about the need to lose weight and reviewed her diet, advising her to continue with the healthy heart diet. She was told to return in three months and engage in activity as tolerated. (*Id.*).

### B. Evaluations and Opinions

On June 20, 2011, Gary Craft, M.D., performed a Disability Determination Examination on behalf of the SSA. (Tr. at 524-32). He began by interviewing Claimant. She related that she had an acute myocardial infarction on November 12, 2010 and required insertion of five stents. She continued to experience intermittent episodes of paroxysmal atrial tachycardia and carried sublingual nitroglycerin as a precaution. Claimant was also prescribed Plavix and Coumadin, atenolol, and Zocor. Claimant indicated that she could climb one flight of stairs or walk one city block at a normal pace without rest. However, she suffered from generalized dull, aching joint pain most prominent in her shoulders, hands, low back and hips. (*Id.*).

Dr. Craft performed a physical examination. (Tr. at 525-26). He observed that Claimant was fully ambulatory and free of acute distress. She had a full range of motion in her neck and upper extremities, and there were no noticeable abnormalities. Her fine manipulation was intact; her reflexes were symmetrical and 2+; her sensation was intact; and her motor strength and tone were normal. Dr. Craft found no abnormalities in the lower extremities. (Tr. at 526). He heard normal heart sounds, and a normal heart rhythm. Claimant's bronchospasm studies revealed a severe obstructive defect; however, Dr. Craft observed very poor effort by Claimant when performing the studies. He felt her physical findings were more compatible with a mild obstructive defect. In summary, Dr. Craft opined that Claimant's long-term prognosis for her cardiovascular system was fair; for her musculoskeletal and psychiatric systems, it was good; and if she stopped smoking, her prognosis for pulmonary health was also good. (Tr. at 527).

James Egnor, M.D., completed a Physical Residual Functional Capacity Assessment form on July 19, 2011. (Tr. at 550-58). Dr. Egnor found Claimant could: occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk about six hours in an eight-hour work day; sit about six hours in an eight-hour work day; and push and pull without limitation. (Tr. at 551). He further opined that Claimant could occasionally perform all postural functions, including climbing stairs, ramps, ladders, ropes, and scaffold; balancing; and stooping, kneeling, crouching, or crawling. (Tr. at 552). She had no manipulative, visual, or communicative limitations. (Tr. at 553-54). As for environmental limitations, Claimant had a unlimited tolerance for wetness, humidity, noise, and hazards, such as machinery or heights. However, she needed to avoid concentrated exposure to extreme cold and heat, vibration, fumes, odors, dusts, gases, and poor ventilation. Dr. Egnor based his

conclusions on Claimant's chronic arthralgias, chronic obstructive pulmonary disease (COPD), and her smoking habit. (Tr. at 554). He commented that Claimant was not fully credible in light of her poor effort at the pulmonary studies. However, he felt that Claimant had a reduced residual functional capacity allowing for no more than light exertional work with the additional postural and environmental limitations. (Tr. at 555).

Narendra Parikshak, M.D. completed a case analysis on September 22, 2011. Dr. Parikshak reviewed Claimant's medical records, noting the lack of new medical records suggesting increased functional limitations. Therefore, Dr. Parikshak affirmed Dr. Egnor's Physical Residual Functional Capacity Examination. (Tr. at 568).

On March 27, 2013, Dr. John Starr responded to interrogatories received from Claimant's attorney. (Tr. at 937). Dr. Starr indicated to a reasonable degree of medical certainty that Claimant's capacity to stand or walk was reduced to less than two hours in an eight-hour work day, and she could lift no more than five pounds regularly. He based these opinions on Claimant's severe coronary disease and history of cardiac arrhythmia, her symptomatic hypertension, and shortness of breath. (*Id.*).

On April 19, 2013, Dr. Davidson answered the same interrogatories supplied by Claimant's attorney. (Tr. at 938). Dr. Davidson opined that Claimant's capacity to stand or walk during an eight-hour work day was limited to less than two hours. He based this opinion on Claimant's severe aorto-iliac occlusive disease with occlusion of the infrarenal aorta. He stated that Claimant had "disabling claudication due to this finding documented by CAT scan angiography." (*Id.*). Nevertheless, Dr. Davidson believed Claimant could lift and carry ten pounds frequently and twenty pounds occasionally, stating that lifting was unrelated to her claudication. He added, though, that Claimant "cannot walk due to pain." (*Id).*

18

## VI.   Standard of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. Thus, the decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). If substantial evidence exists, then the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   Discussion

Both of Claimant's challenges to the Commissioner's decision involve findings and opinions offered by Claimant's treating cardiologist and treating vascular surgeon. She complains that the ALJ intentionally overlooked statements made by her physicians that corroborate her claims regarding the intensity, persistence, and disabling effects of the arteriosclerosis in her lower extremities. As a result, the ALJ erroneously found that

Claimant could perform light level exertional work; even though, she is physically unable to stand and walk the six hours per day required by that exertional level. In addition, Claimant contends that the Appeals Council failed to give adequate attention to the RFC opinions offered by Dr. Starr and Dr. Davidson after the administrative hearing. Having reviewed the evidence and the written decision of the ALJ, the undersigned agrees with Claimant.

### A. The ALJ's RFC Finding

Social Security Ruling ("SSR") 96–8p provides guidance on how to properly determine a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96–8p, 1996 WL 374184, at *1 (S.S.A. 1996). RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations and is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." *Id.* Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to

do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

When finding a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96–8p, 1996 WL 374184, at *7. The ALJ should "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (e.g. 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the record." *Id.* Further, the ALJ should "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.*

Here, the ALJ found that Claimant was capable of performing light exertional work with some postural and environmental limitations. (Tr. at 15). Light work is defined as:

> [L]ifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b). The ability to stand and walk required by this exertional level is further clarified in SSR 83-10, which provides that light level jobs often require frequent walking and standing—"the primary difference between

21

sedentary and most light jobs." SSR 83-10, 1983 WL 31251, at *5 (S.S.A. 1983). According to SSR 83-10:

> "Frequent" means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work.

*Id.,* at *6.

The ALJ based his conclusion that Claimant was capable of doing light level exertional work, including standing and walking up to six hours out of an eight-hour workday, on a review of the medical evidence; the opinions of three agency consultants, Dr. Craft, Dr. Egnor, and Dr. Parikshak; Claimant's daily activities; and her alleged lack of credibility. (Tr. at 15-20). While the ALJ approached the RFC assessment correctly, he erred in his analysis by failing to thoroughly consider, or appreciate the significance of, key evidence in the record. For example, when summarizing Claimant's presentation to Princeton Community Hospital on November 12, 2010, the ALJ stated:

> [S]he was assessed with acute chest pain. Physical examination was unremarkable. ... Psychiatric examination was unremarkable revealing normal mood and affect. The claimant was treated, prescribed medications and discharged in stable condition.

(Tr. at 16). In truth, the hospital visit was far more serious and complicated than reflected in the ALJ's bland summary. Upon her arrival at Princeton Community Hospital, Claimant was triaged as a critical care patient in light of her symptoms and appearance. (Tr. at 257-58). Her blood pressure was 161/100, and she was experiencing

acute chest pain that radiated from her left shoulder and was accompanied by sweating and shortness of breath. (Tr. at 257-59). An EKG was abnormal with non-specific changes and cardiac enzyme testing was consistent with a myocardial infarction. (Tr. at 261, 265). The formal tentative diagnosis was chest pain, rule out myocardial infarction; however, the emergency room physician documented his suspicion that Claimant was suffering a non-Q wave cardiac arrest. (Tr. at 274). After treating her with several intravenous medications to stabilize her for transfer, the emergency room physician sent Claimant by ambulance directly to the thoracic intensive care unit at Roanoke Memorial Hospital, because there was "no interventional cardiology coverage" at Princeton Community Hospital. (Tr. at 272, 273-74). Thus, the emergency room physician anticipated that Claimant would need an urgent interventional procedure, such as a cardiac catheterization, before discharge. When evaluated by the receiving cardiologist at Roanoke Memorial Hospital, Claimant was diagnosed with a non-ST segment elevation myocardial infarction and was scheduled for a cardiac catheterization that same day. (Tr. at 342-43). Dr. Williams performed the catheterization and found moderate arteriosclerosis in Claimant's left anterior descending vessel, and total occlusions in the circumflex and right coronary arteries. (Tr. at 345). Claimant required percutaneous revascularization with the use of a bare metal stent. (*Id.*). In addition, Claimant underwent a second procedure a few days later to address a subtotally occluded native right coronary artery. (Tr. at 346-47). This time, the revascularization effort required the use of three bare metal stents. (*Id.*). Clearly, the ALJ greatly understated the extent of Claimant's cardiac disease and treatment in his review of the relevant evidence.

Similarly, when describing Claimant's follow-up visit with Dr. Journigan one year

later on November 7, 2011, the ALJ stated:

> Echocardiogram (ECHO) revealed aortic valve sclerosis without evidence of stenosis, mitral annular calcification, and diastolic dysfunction, but normal left ventricular systolic function with an ejection fraction of 55-60 percent. ... Physical examination was unremarkable .... Dr. Journigan continued medication management.

(Tr. at 17). However, the ALJ failed to mention that Claimant also had an abnormal myocardial perfusion study in West Virginia that she showed to Dr. Journigan, and based upon that study, Dr. Journigan referred Claimant to Dr. Williams "to perform a left cardiac catheterization to evaluate for any restenosis of the stents verses new stenosis." (Tr. at 608). Accordingly, contrary to the ALJ's assessment of the evidence, Dr. Journigan did not simply continue medication management; instead, she specifically referred Claimant to an interventional cardiologist for yet another invasive procedure, because she feared a recurrent or new narrowing of the blood vessels feeding Claimant's heart. Once again, the ALJ minimized the seriousness of Claimant's medical findings and treatment.

Perhaps most relevant to Claimant's challenges, the ALJ never addressed Dr. Williams's findings made during Claimant's third cardiac catheterization on November 18, 2011, which led to her referral to a vascular surgeon, Dr. Jesse Davidson. Prior to performing the catheterization, Dr. Williams documented that Claimant complained of "a progressive claudication ... involving both lower extremities to the point where she now had difficulty ambulating." (Tr. at 631). During the procedure, Dr. Williams inserted the catheter into the left femoral artery,[2] but was unable to move the wire past

---

[2] The femoral artery is located in the thigh, extending from the external iliac artery down the leg, supplying blood to the lower portion of the body. *See* Medline Plus Medical Dictionary © 2015 by Merriam-Webster, Incorporated.

the proximal portion of the left common iliac artery. (*Id.*). When he did a sheath angiography to determine the problem, he found a total occlusion of the proximal left common iliac artery versus a distal aortic occlusion.[3] In either case, Dr. Williams was not able to complete the catheterization through the femoral artery and had to approach through the brachial artery, above the heart. (Tr. at 631-32). After the procedure, Dr. Williams wrote: "I will also arrange for the patient to see a local vascular surgeon as she likely will require surgical peripheral bypass surgery for her obstructive lower extremity disease. The patient has become quite debilitated with claudication type symptoms and associated perceived leg weakness." (*Id.*). In short, in the eleven-month interim between Claimant's second and third catheterizations, she developed a total occlusion of a major vessel providing oxygenated blood to her pelvis and to at least one of her lower limbs, significantly affecting her ability to stand and walk.

Moreover, as Claimant points out, although the ALJ discussed her visits with Dr. Davidson, the ALJ failed to acknowledge Dr. Davidson's repeated references to Claimant's peripheral vascular disease as "disabling." (Tr. at 647, 738, 825). The ALJ likewise failed to acknowledge that in March 2012, Dr. Davidson scheduled Claimant to undergo a CT angiography ("CTA") of the aorta with lower extremities, which confirmed Claimant's significant peripheral vascular disease. (Tr. at 823-24). The CTA revealed an occluded aorta at the bifurcation of the common iliac arteries, with large lumbar collaterals extending off the distal abdominal aorta; occluded common iliac arteries bilaterally, with reconstitution at their bifurcations; and the presence of plaque stenosis of the internal iliac arteries bilaterally. (Tr. at 823). Rather than addressing these

---

[3] The aorta runs from the heart through the chest and down to the abdomen where it branches into the common iliac arteries. An occlusion of a common iliac artery or the distal aorta will significantly reduce blood flow to the affected extremity (ies), causing claudication. *See* Kenneth E McIntyre Jr, MD, *Aortoiliac Occlusive Disease,* updated Jun. 17, 2013. © 1994-2015 by WebMD LLC.

significant findings as part of the RFC assessment, the ALJ mentioned only that a CT scan of the pelvis, abdomen, and extremities performed at the same time "revealed mild lower extremity edema in the legs, ankles, and feet, but no significant osseous abnormalities." (Tr. at 17). When considering that the CTA was performed specifically to look for blood vessel disease causing Claimant's claudication, it was illogical for the ALJ to ignore the positive findings on CTA and discuss only the relatively trivial and somewhat tangential findings seen on CT scan; unless, as Claimant contends, the ALJ was attempting to "cherry-pick" the evidence for information that best suited his predetermined outcome.

The Commissioner argues that any error in the ALJ's review of the evidence is harmless given that Claimant has failed to prove prejudice from the error, i.e. that the outcome of the Commissioner's decision would have been different had the error not been made. According to the Commissioner, Claimant's allegation of disabling arteriosclerosis is simply not credible in light of "her examination findings, positive response to treatment, and her high level of functioning on a daily basis." (ECF No. 14 at 8).

Courts have routinely applied a harmless error analysis to administrative decisions that do not fully comport with the procedural requirements of the agency's regulations, but for which remand "would be merely a waste of time and money." *See, e.g., Jenkins v. Astrue,* 2009 WL 1010870 at *4 (D.Kan. Apr. 14, 2009) (citing *Kerner v. Celebrezze,* 340 F.2d 736, 740 (2d Cir. 1965)). The Fourth Circuit has applied a similar analysis in the context of Social Security disability determinations. *See Morgan v. Barnhart,* 142 F.App'x 716, 722–23 (4th Cir. 2005) (unpublished); *Bishop v. Barnhart,* 78 F.App'x 265, 268 (4th Cir. 2003) (unpublished). In general, remand of a procedurally

deficient decision is not necessary "absent a showing that the [complainant] has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Connor v. United States Civil Service Commission,* 721 F.2d 1054, 1056 (6th Cir.1983); *Burch v. Astrue,* 2011 WL 4025450, at *6 (W.D.N.C July 5, 2011) (*citing Camp v. Massanari,* 22 F.App'x 311 (4th Cir. 2001)) (Claimant must show that absent error, the decision might have been different).

While in principle, the undersigned agrees with the Commissioner's view of the harmless error doctrine, her argument simply is not persuasive under the facts of the instant action. An ALJ's error is harmless when it does not substantively prejudice the claimant. *See Mascio v. Colvin,* 780 F.3d 632, 639 (4th Cir. 2015) (finding that an ALJ's error in assessing a claimant's credibility after, instead of before, determining his RFC would be harmless so long as the ALJ conducted a proper credibility assessment); *Tanner v. Comm'r of Soc. Sec.,* No. 14–1272, ––F.Appx. ––, ––, 2015 WL 574222, at *5 (4th Cir.  Feb. 12, 2015) (finding an ALJ's error to be harmless where it was "highly unlikely, given the medical evidence of record, that a remand to the agency would change the Commissioner's finding of nondisability"); *Austin v. Astrue,* No. 7:06–CV–00622, 2007 WL 3070601, *6 (W.D.Va. Oct. 18, 2007) ("[E]rrors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error") (citing *Camp,* 22 F. App'x at 311). In order for a reviewing court to find an error harmless, the court must be able to plainly see from the ALJ's written decision that the prejudicial effect of the ALJ's mistake was, in some way, remedied, so that a final determination of nondisability is indeed supported by substantial evidence. However, in this case, the ALJ never actually acknowledged or discussed the functional effect of Claimant's arteriosclerosis of the distal aorta with its

collateral circulation, the occluded common iliac arteries, the plaque stenosis found in the internal iliac arteries, and the treating physician's statements that Claimant had disabling claudication.

While an ALJ is not required to comment on every piece of evidence in the record, he is obligated to discuss the evidence supporting his decision *as well as* "the uncontroverted evidence he chooses not to rely upon," and "significantly probative evidence he rejects." *Clifton v. Chater,* 79 F.3d 1007, 1010 (10th Cir. 1996) (citing *Vincent ex rel. Vincent v. Heckler,* 739 F.2d. 1393 (9th Cir. 1984)). The ALJ must "explain on the record the reasons for his findings, including the reason for rejecting relevant evidence in support of the claim. Even if legitimate reasons exist for rejecting or discounting certain evidence, the [ALJ] cannot do so for no reason or for the wrong reason." *King v. Califano,* 615 F.2d 1018, 1020 (4th Cir.1980) (citation omitted). Evidence reflecting the severity of Claimant's cardiac disease on its initial presentation and the appearance of occluded vessels distally less than one year later was highly probative of Claimant's alleged disability. The impact Claimant's occluded distal aorta and occluded common iliac arteries had on her ability to stand and walk was particularly important to discern given that the medical source opinions relied upon by the ALJ all pre-dated Dr. Davidson's discovery of significant arteriosclerosis in vessels feeding Claimant's extremities. Because of the ALJ's perplexing failure to analyze and discuss medical evidence that potentially made a major difference in the RFC finding, the Court "cannot tell whether [the ALJ's] decision is based on substantial evidence." *Cook v. Heckler,* 783 F.2d 1168, 1172 (4th Cir. 1986). Consequently, the error is not harmless, and the matter should be remanded so that proper attention can be given to the medical evidence surrounding Claimant's arteriosclerosis of the distal aorta and iliac arteries.

### B.  The Appeals Council's Treatment of Medical Source Opinions

Claimant's second challenge is based on the Appeals Council's perfunctory dismissal of RFC opinions provided by Dr. Starr and Dr. Davidson after the ALJ had issued his written decision, but before the Appeals Council had decided Claimant's request for review. Claimant argues that notwithstanding the Appeals Council's receipt and acceptance of the opinions, which were offered by treating physicians and directly contradicted the ALJ's RFC finding, the Appeals Council erroneously concluded that the opinions "[did] not provide a basis for changing the Administrative Law Judge's decision." (Tr. at 2; ECF No. 11 at 9-10). In response, the Commissioner contends that the physicians' opinions are not new, material, or relevant; therefore, remand based on the opinions is not warranted. The Commissioner points out that the opinions post-date the "relevant period" examined by the ALJ, indicating that if Claimant's condition worsened after the relevant period, her remedy is to file a new application for benefits, not have a proper decision overturned. (ECF No. 11 at 10-12). The undersigned finds the Commissioner's position to be without merit.

The Court may remand the Commissioner's decision for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g). A sentence four remand is appropriate when the Commissioner's decision is not supported by substantial evidence, the Commissioner incorrectly applies the law when reaching the decision, or the basis of the Commissioner's decision is indiscernible. *Brown v. Astrue,* Case No. 8:11–03151–RBH–JDA, 2013 WL 625599 (D.S.C. Jan. 31, 2013) (citations omitted). If new and material evidence is submitted after the ALJ's decision, the Appeals Council:

> shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and

29

> material evidence submitted if it relates to the period on or before the date
> of the administrative law judge hearing decision. It will then review the
> case if it finds that the administrative law judge's action, findings, or
> conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R 404.970(b). When the Appeals Council incorporates new and material evidence into the administrative record, and nevertheless denies review of the ALJ's findings and conclusions, the issue before the Court is whether the Commissioner's decision is supported by substantial evidence in light of "the record as a whole including any new evidence that the Appeals Council specifically incorporated into the administrative record." *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011) (remanding for rehearing pursuant to sentence four of 42 U.S.C. § 405(g)) (quoting *Wilkins v. Sec'y, Dep't of Health and Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (internal marks omitted)). If the ALJ's decision is flawed for any of the reasons stated, the Court may remand the matter for a rehearing under sentence four.[4]

By incorporating the RFC opinions of Dr. Starr and Dr. Davidson into the record and considering them as additional evidence, the Appeals Council conceded that the opinions were new, material, and relevant to the disability decision at issue. *See Gentry v. Colvin,* No. 2:13-CV-66-FL, 2015 WL 1456131, at *2-3 (E.D.N.C. Mar. 30, 2015); *Smith v. Colvin,* C/A No.: 1:14-cv-0489 DCN, 2015 WL 1263040, at *18 (D.S.C. Mar. 18. 2015). The only question for the Court is whether the ALJ's decision is supported by substantial evidence in view of the record, as supplemented with the new, material, and relevant evidence considered by the Appeals Council. Even if that were not the case, the opinions of Drs. Starr and Davidson are plainly relevant, material, and new. Indeed, the opinions unquestionably relate to the ongoing cardiac and vascular problems

---

[4] Sentence four allows the court to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

experienced by Claimant, which began on the disability onset date. Furthermore, they include functional limitations never previously provided by the physicians. Moreover, these opinions are material given that they effectively prohibit Claimant from performing light level exertional work, and the only jobs the ALJ explicitly found Claimant capable of performing were in the light exertional level. Consequently, the opinions could change the outcome of the case. *See Bratton v. Colvin,* Civil Action No. 7:13cv00421, 2015 WL 1275181, at *6 (Mar. 19, 2015) ("Courts ... review[] the record as a whole to determine if the new evidence is contradictory, presents material competing testimony, or calls into doubt any decision grounded in the prior medical reports. If the new evidence creates ... a conflict, there is a reasonable possibility that it would change the outcome of the case, and the case must be remanded to the Commissioner to weigh and resolve the conflicting evidence.").

Therefore, the undersigned **FINDS** that the Appeals Council erred in its treatment of the medical source opinions of Dr. Starr and Dr. Davidson. Considering that these opinions limit Claimant to standing and walking less than two hours in an eight-hour work day, the opinions directly contradict the ALJ's conclusion that Claimant is capable of performing light exertional work. The ALJ only considered light exertional occupations for Claimant; therefore, the Appeals Council should have granted Claimant's request for review.

Although, Claimant is correct that the decision of the Commissioner is not supported by substantial evidence and should be reversed, the undersigned disagrees that an award of benefits should be ordered by the Court. The Court is not authorized to weigh the evidence, or reconcile conflicts in the record or among the opinions of medical sources. While Claimant may not be capable of performing light level work, she may be

able to perform sedentary jobs. The ALJ did not determine whether there were jobs in the sedentary range that Claimant could perform despite her limitations. Therefore, the matter should be remanded to allow the Commissioner to reconcile the inconsistencies in the record; to weigh the opinions and amend the RFC finding, if appropriate; and to determine with the help of a vocational expert whether there are jobs available in sufficient numbers in the national economy that Claimant is capable of performing despite her particular limitations. *See Smith v. Colvin,* Civil Action No. 9:14-cv-219-MGL, 2015 WL 1897614, at *7 (Apr. 14, 2014).

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** the motions of both parties, but nonetheless **REVERSE** the final decision of the Commissioner and **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with the proposed findings and recommendations herein. The undersigned further recommends that this action be **DISMISSED, with prejudice,** and removed from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A, Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed

Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Faber and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** May 26, 2015

Cheryl A. Eifert
United States Magistrate Judge